# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00579-CR

**John Roman Rocha, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 7 OF TRAVIS COUNTY
### NO. C1CR06732914, HONORABLE ELISABETH ASHLEA EARLE, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted John Roman Rocha of the offense of driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04 (West 2003). Punishment was assessed at 90 days in jail and a $2,000 fine, but the trial court suspended imposition of the sentence and placed Rocha on community supervision for two years. In a single point of error, Rocha asserts that the trial court erred in not submitting an article 38.23 instruction to the jury. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005). We will affirm the judgment.

### BACKGROUND

The jury heard evidence that, on the night of April 28, 2006, Officer Rolando Ramirez of the Austin Police Department was traveling southbound in downtown Austin when he stopped at a red light at the intersection of Guadalupe and 15th Street. In the lanes next to his, Ramirez observed a taxi and a 2000 Chevy Trailblazer pickup truck. Ramirez testified that, when the light

turned green, he heard "what appeared to be a vehicle accelerating at a high rate of speed." According to Ramirez, he noticed that the taxi was "not moving too fast," but "the truck was making the back tires squeal." Then, Ramirez recounted, "the truck took off." Ramirez checked his radar and clocked the vehicle speeding at the rate of 60 miles per hour. The posted speed limit at that location, Ramirez testified, was 30 miles per hour. Ramirez proceeded to pursue the truck.

Ramirez testified that he caught up to the vehicle at 11th Street, where it "made a quick turn to the left . . . still accelerating." Ramirez recalled that the truck "came close to hitting the back of a vehicle" that was in front of it. The truck then made another left turn onto Lavaca Street and "started driving real slow, between 12 and 10 miles per hour." Ramirez noticed the right tires of the truck move into the other lane and cross the white lines. The driver of the truck then activated his turn signal and came to a stop on the side of the street.

Ramirez came to a stop behind the truck, approached the driver, and asked to see his license and registration. According to Ramirez, the driver, now identified as Rocha, "was having some problems with his movements." Additionally, Rocha "had bloodshot eyes and a strong odor of alcohol." Ramirez asked Rocha if he had been consuming alcohol. Ramirez testified that Rocha admitted to him that "he had a couple of mixed drinks." Ramirez also recalled that Rocha sounded "thick-tongued," meaning that Ramirez had difficulty understanding what Rocha was saying.

Ramirez then walked back to his patrol car, moved it to an empty parking lot next to where they had pulled over, and set up his in-car camera for the purpose of recording Rocha's performance on field sobriety tests.[1] When Ramirez returned to Rocha's truck, he asked him to

---

[1] The video recording was played for the jury during Ramirez's testimony.

exit his truck and accompany him to the front of his patrol car. According to Ramirez, Rocha "staggered" as he first exited his truck and walked toward the patrol car. Once Rocha was at the patrol car, Ramirez again questioned Rocha about his alcohol consumption. Ramirez testified, "At the beginning, he said he had some—a drink at a bar; he doesn't remember what he was drinking. It was Coke and something else. Later, he told me that it was a shot and two drinks. He was not familiar with the name of the alcohol he was drinking." Ramirez also testified that Rocha was confused about the location of the bar where he had been drinking; Rocha was not sure if it was on 5th Street or 6th Street, but he eventually told Ramirez that the bar was called Fabric, which was on 5th Street.

Next, Ramirez administered four field sobriety tests—the horizontal gaze nystagmus (HGN), the walk-and-turn, the one-leg-stand, and the Romberg balance test. On the HGN test, in which the subject's eye movements are observed, Ramirez noticed "six clues" suggesting intoxication, which is the most possible that can be observed. On the walk-and-turn test, Ramirez observed that Rocha "turned improperly and he failed to touch heel to toe." On the one-leg-stand test, Ramirez testified, Rocha "swayed, he placed his foot down three times, and he used his arms for balance."

The final test Ramirez had Rocha perform was the Romberg balance test. Ramirez explained this test and described Rocha's performance on it as follows:

A:     The test consists of me giving him instructions about tilting his head back, closing his eyes, and estimating 30 seconds. . . . I tell him, after that 30 seconds have passed, for him to lift his head forward and open his eyes.

Q:     And what are you looking for in this test?

3

A:    I am looking for the estimation of—of time, and also the sway.

Q:    And what did you observe the Defendant do?

A:    He had a one-inch sway, and he estimated 30 seconds as 35 seconds.

Q:    And is this a standardized field sobriety test?

A:    No, it's not.

Q:    Then why do you use it?

A:    It's just a test that we use to be fair with that person.  We look for the estimation of time, and also the sway.

On cross-examination, Officer Ramirez was asked additional questions about Rocha's performance on the Romberg test.  During this line of questioning, the video recording of Rocha's performance on the test was replayed for the jury, and Ramirez admitted that his estimate of the amount of time it took Rocha to complete the test was at odds with the recording.

Q:    35 seconds, right?

A:    That is what I have down in my PC and report, sir.

Q:    From both your observation on the scene and afterwards, watching the tape.

A:    That is correct.  That's what I estimated.

      (Playing video)

      (Pausing video)

Q:    He nailed it, didn't he?

A:    It is 27 seconds when he placed his foot face forward.  He started at 56, 57, so—

Q:    He nailed it.

4

A:  That's correct, sir.  It shows 30 seconds.

Q:  He passed it.

A:  It's not a pass-and-go test.  Again, I'm looking for clues of intoxication.

. . . .

Q:  And on your own probable cause affidavit, Romberg balance, also known as the head tilt or modified attention, estimated 30 seconds as—

A:  35 seconds, sir.

Q:  And he got 30 seconds, did he not?

A:  That is correct, sir.

Q:  And you arrested him.

A:  Yes, sir.

Ramirez testified that, after he arrested Rocha and transported him to the Travis County jail, Rocha agreed to give a breath sample.  Ramirez proceeded to administer two breath tests, approximately three minutes apart.  The results of the tests were admitted into evidence through the testimony of Debra Stephens, a senior forensic scientist with the Austin Police Department.  According to Stephens, the tests showed that Rocha had a blood alcohol concentration of .151 and .150.  To reach those levels, Stephens testified, one would have had to consume "at least" "about eight or nine drinks."

The jury subsequently found Rocha guilty of committing the offense of driving while intoxicated, and Rocha was placed on community supervision.  This appeal followed.

**ANALYSIS**

In his sole point of error, Rocha asserts that the trial court erred in failing to submit an article 38.23 instruction to the jury. Rocha contends that an article 38.23 instruction was required because Officer Ramirez provided contradictory testimony about Rocha's performance on the Romberg balance test. On direct, Ramirez testified that Rocha performed the test in 35 seconds. On cross, however, Ramirez admitted that Rocha performed the test in 30 seconds, as the test's instructions required. According to Rocha, "the officer's admission raised a fact question as to whether the officer reasonably believed that Appellant failed the test." Rocha further asserts that "the officer's admission about the test called his entire credibility into question," and, therefore, Ramirez's "other reasons for the arrest were disputed fact issues warranting an instruction" under article 38.23.

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If error exists, we then evaluate the harm caused by the error. *Ngo*, 175 S.W.3d at 743; *Swearingen*, 270 S.W.3d at 808. The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171. By contrast, unobjected-to charge error requires reversal only if it resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

6

Article 38.23 provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." Tex. Code Crim. Proc. Ann. art. 38.23(a). The statute further provides, "In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." *Id*.

The terms of article 38.23(a) are "mandatory, and when an issue of fact is raised, a defendant has a statutory right to have the jury charged accordingly." *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). However, "[a] defendant's right to the submission of jury instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible." *Id*. In other words, "The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct." *Id*. at 511. "[I]f other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence." *Id*. at 510. Further, "[t]o raise a disputed fact issue warranting an Article 38.23(a) jury instruction, there must be some affirmative evidence that puts the existence of that fact into question." *Id*. at 513.

In *Madden v. State*, the principal case on which Rocha relies, the court of criminal appeals discussed the circumstances when an article 38.23 instruction is and is not required. *See id*. at 513-14. In *Madden*, the arresting officer, D.P.S. Trooper Lily, observed two vehicles speeding,

7

a gray Dodge and a green GMC Jimmy. *Id*. at 506. As Lily pursued both vehicles, the Jimmy accelerated, passed the Dodge, and began tailing an 18-wheeler. *Id*. Lily, who had been trained in "drug convoy tactics," inferred from these actions that the Jimmy driver was attempting to divert his attention away from the Dodge. *Id*. Lily testified that he stopped both vehicles for speeding.[2]

After Lily stopped both vehicles, he approached the driver of the Dodge, who was identified as the defendant. *Id*. Lily testified that the defendant's hands were "shaking tremendously," his face was "trembling," and he "fumbled for his wallet." Lily found this "nervous" behavior to be suspicious. *Id*. Lily also testified that the defendant provided inconsistent answers to questions about where he had come from, how long he had been there, and where he was going. *See id*. Additionally, Lily explained, the defendant told him that he was driving a rental car. *Id*. When Lily examined the rental agreement, he saw that the vehicle had been rented in Florida and that the agreement had expired four days earlier. *Id*. Suspecting that the defendant's vehicle contained contraband, Lily detained the defendant until drug dogs arrived so that the vehicle could be searched for illegal drugs. *Id*. When the drug dogs arrived, cocaine was found inside the vehicle. *Id*. at 507.

During trial, a video recording of the traffic stop and detention was played for the jury. *Id*. On the recording, the defendant could be heard disputing the fact that he had been speeding. *Id*. On cross-examination, defense counsel also questioned Lily extensively about whether the defendant was really acting nervous during the stop, claiming that he (defense counsel)

_____

[2] *See Madden v. State*, 177 S.W.3d 322, 324 (Tex. App.—Houston [1st Dist.] 2005), *rev'd*, 242 S.W.3d 504 (Tex. Crim. App. 2007).

8

could not see the defendant's nervous behavior on the recording. *Id*. However, Lily maintained in his testimony that the defendant was acting nervous and that the recording confirmed this, even though the poor quality of the recording might have made the defendant's behavior difficult to observe on tape. *Id*.

At the charge conference, defense counsel requested an article 38.23 instruction on the legality of both (1) the initial traffic stop for speeding; and (2) the defendant's continued detention until the drug dogs arrived. The trial court concluded that there was a disputed fact issue about whether the defendant was speeding, thus it agreed "that there should be a charge on that issue." *Id*. at 508. However, finding no disputed fact issue regarding the defendant's continued detention, the trial court declined to submit an article 38.23 instruction on that issue. *Id*.

The court of criminal appeals agreed with the trial court, on both issues. The basis for the traffic stop was Lily's belief that the defendant had been speeding. *Id*. at 511. Lily testified that he clocked the defendant's vehicle going 61 miles per hour in a 55 miles-per-hour zone. *Id*. at 506. However, on the recording of the traffic stop, the defendant could be heard telling Lily that he was not speeding and that his cruise control had been set at 55 miles per hour. *Id*. at 507 Thus, there was "affirmative evidence" in the record disputing the sole fact that provided the basis for the traffic stop. *Id*. at 514. Accordingly, the court held, an article 38.23 instruction on that issue was required. *Id*. at 511.

On the other hand, the court of criminal appeals held that an article 38.23 instruction was not warranted on the issue of the defendant's continued detention, for two reasons. First, "there was no conflict in the evidence" regarding the facts on which Lily relied in continuing to detain the

9

defendant. *Id*. at 513. The court explained that Lily, despite being extensively cross-examined by defense counsel, "never admitted that he was wrong about appellant's nervous behavior." *Id*. at 515. As for the videotape that purported to show the defendant's nervous behavior or lack thereof, the court concluded that the recording "apparently does not show much of anything with clarity."[3] *Id*. at 516. Thus, there was no "affirmative evidence of a disputed historical fact" relevant to the issue of the defendant's continued detention. *Id*.

Second, the court reasoned that, "[e]ven if the videotape or a witness had provided affirmative evidence that the defendant did not, in fact, appear to be nervous when Trooper Lily encountered and questioned him, the officer still had ample basis for his reasonable suspicion to detain appellant for the arrival of the drug dog." *Id*. The court explained,

> If Trooper Lily did not have reasonable suspicion to detain appellant unless he acted nervously, then a dispute about that fact would require a jury instruction. If, however, appellant's purported nervousness is not a fact that is crucial to a legal finding of reasonable suspicion, then that disputed fact issue need not be submitted to the jury.

*Id*. at 517. In the court's view, the "totality of the other facts" in the case "was legally sufficient to support further detention," and the defendant's "purported nervousness is lagniappe—icing-on-the-cake—to the determination of reasonable suspicion. It is not crucial." *Id*. The court concluded that, "to obtain a jury instruction under Article 38.23(a), the disputed fact must be one that affects the determination of the legal issue." *Id*.

---

[3] The court explained that it was unable to review the videotape because it was not included in the appellate record. Therefore, the court deferred to the trial court's assessment of the exhibit's lack of clarity. *See Madden v. State*, 242 S.W.3d 504, 516 (Tex. Crim. App. 2007).

10

In this case, the legal issue during trial was whether Ramirez had probable cause to arrest Rocha for DWI. The disputed fact was Rocha's performance on the Romberg balance test. Thus, the trial court was required to submit an article 38.23 instruction if this disputed fact was material to the determination of whether Ramirez had probable cause to arrest Rocha for DWI. We conclude that it was not.

"'Probable cause' for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer." *Id*. (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

The totality of the circumstances facing Ramirez at the time he arrested Rocha for DWI included the following:

- Ramirez clocked Rocha speeding at the rate of 60 miles per hour in downtown Austin, make a quick left turn onto 11th Street while accelerating, and "c[o]me close to hitting the back of a vehicle" that was in front of him. According to Ramirez, Rocha then made another left turn onto Lavaca Street and "started driving real slow, between 12 and 10 miles per hour." Before Rocha pulled over, Ramirez noticed Rocha's right tires move into the other lane and cross the white lines.

- Ramirez testified that, when he approached Rocha, he observed that Rocha "had bloodshot eyes and a strong odor of alcohol" and "was having some problems with his movements" when he displayed his license. Rocha also sounded "thick-tongued," meaning that Ramirez had difficulty understanding what he was saying.

11

- Rocha at first admitted to Ramirez that "he had a couple of mixed drinks." Later, Rocha told Ramirez that he had a shot and two drinks. However, Rocha was unable to remember what kind of alcohol he had been drinking, and he was also confused about the location of the bar where he had been drinking.

- According to Ramirez, when Rocha exited his truck and walked toward the patrol car to perform the field sobriety tests, his initial movements were "staggered."

- On the HGN test, Ramirez noticed "six clues"—the most possible—suggesting that Rocha was intoxicated.

- On the walk-and-turn test, Ramirez observed that Rocha "turned improperly and he failed to touch heel to toe."

- On the one-leg-stand test, Ramirez testified, Rocha "swayed, he placed his foot down three times, and he used his arms for balance."

The trial court could have found that the above facts were sufficient to provide Ramirez with probable cause to arrest Rocha for committing the offense of DWI, even in the absence of any testimony about Rocha's performance on the Romberg balance test. *See id*. at 879 (finding probable cause to arrest defendant for DWI when officer observed defendant speeding, responding slowly to officer requests, smelling of alcohol, and officer administered only three field sobriety tests (HGN, walk-and-turn, and one-leg-stand)); *Washburn v. State*, 235 S.W.3d 346, 351 (Tex. App.—Texarkana 2007, no pet.) (finding probable cause to arrest defendant for DWI when defendant admitted drinking, had slurred speech, and officer could detect odor of alcohol on or about defendant's person); *Knisley v. State*, 81 S.W.3d 478, 483-84 (Tex. App.—Dallas 2002, pet. ref'd) (finding probable cause to arrest defendant for DWI when evidence at accident scene suggested defendant lost control of motorcycle, defendant was unable to answer simple questions, and defendant smelled strongly of alcohol); *Reynolds v. State*, 902 S.W.2d 558, 560

(Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (finding probable cause to arrest defendant for DWI when officer testified defendant had slurred speech, bloodshot eyes, breath that smelled of alcohol, and posed danger to himself and others). In fact, Ramirez testified that the Romberg test was neither a standardized field sobriety test nor a "pass-and-go test," and he administered it after Rocha performed the other tests just "to be fair" with Rocha. As Ramirez explained, throughout his investigation, he was "looking for clues of intoxication," and the Romberg test was just one part of this process. Ramirez testified:

> Q: And after this test [the one-leg-stand], you still had not formed any opinion whether he was intoxicated.
>
> A: No. I'm still trying to give him the benefit of the doubt that he's not impaired, he's able to drive a motor vehicle, sir.
>
> Q: It was after the next and last test, the Romberg balance, that you finally formed the opinion that he was intoxicated.
>
> A: That was just that test. I gathered the whole thing. The driving, the speech, the odor of alcohol, everything together. Then I made my decision to make the arrest or not, sir.
>
> Q: Okay. At this point, after this test, still no decision. Still open-ended. It's like you want to do another test just to give him the benefit of the doubt. You wanted to be fair. At least—
>
> A: Again, I'm—I'm gathering all the information. I have everything in mind that I saw, that I smell, everything I heard. After everything is done, the last test—I gave him the last test; and after everything is done, then I make my decision to make the arrest or not.
>
> Q: Okay. So at this point, still no opinion.
>
> A: I have my opinion, sir, but it's not that I'm going to arrest this person or not. I have everything in mind.

13

Q:     Have you ever stopped at this point, or even earlier, because you've already formed the opinion, and arrested somebody? Not go through all the tests?

A:     No, sir.

Q:     You're saying you've always done all four tests on every single person you've ever stopped.

. . . .

A:     I follow the NHTSA manual and the rules. And I have to do at least—all the tests. The Romberg balance is just an extra test we give them. We have the option to do it or not. In this case, I did the Romberg balance.

Thus, the disputed fact regarding Rocha's performance on the Romberg test was not "essential" to the determination of whether Ramirez had probable cause to arrest Rocha for DWI. *See Madden*, 242 S.W.3d at 511; *see also Merriweather v. State*, 501 S.W.2d 887, 891 (Tex. Crim. App. 1973) (holding that, when specific facts used by court to determine existence of probable cause were uncontested, defendant was not entitled to jury instruction concerning other facts—which were contested—that did not defeat finding of probable cause); 40 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 4.194 (2d ed. 2001) ("Jury submission, then, is only required when facts are raised that are necessarily determinative of the admissibility of the challenged evidence."). Accordingly, Rocha was not entitled to an article 38.23 instruction on this issue.

Rocha concedes that "the other facts Officer Ramirez testified about—if true—would support a finding of probable cause, aside from his performance on the Romberg balance test." However, Rocha claims that Ramirez's contradictory testimony about the Romberg test calls into question the truthfulness of his entire testimony. Rocha asks,

14

> If an officer admits that one of the facts leading him to arrest a defendant did not exist, does not that create a dispute as to the other facts, too? If Ramirez's conclusion about the balance test was untrue or incorrect, does that not bring into question his testimony about the other sobriety tests, too?

Rocha claims that this issue has not been addressed by the court of criminal appeals. To the contrary, as we have already explained, in *Madden*, the court held that, in order for a defendant to be entitled to an article 38.23 instruction, there must be some "affirmative evidence" that puts the existence of a fact into dispute. *See id*. at 513. Here, no affirmative evidence contesting the other facts supporting the officer's probable-cause determination was presented.

Rocha explains that the defense strategy during trial was to repeatedly attack and undermine Ramirez's credibility with the jury. According to Rocha, "beginning with trial counsel's very first question to the officer,[4] the defense strategy was to challenge Officer Ramirez on virtually everything he said." A similar strategy was employed in *Madden*. *See id*. at 507 n.4 (reprinting certain portions of trial counsel's extensive cross-examination of Trooper Lily). However, the court held that "a cross-examiner's questions do not create a conflict in the evidence, although the witness's answers to those questions might." *Id*. at 513. The court explained that, despite the extensive cross-examination to which Lily was subjected, "the officer never admitted that he was wrong about appellant's nervous behavior." *Id*. at 515. Similarly, in this case, despite defense counsel's extensive cross-examination of Ramirez, Ramirez's only admission was that he was wrong about Rocha's performance on the Romberg test. Ramirez did not admit that he was wrong about

---

[4] Counsel's first question on cross-examination was, "Officer Ramirez, do you want to just come out now and tell these jurors you're a liar?"

any other fact on which he relied in forming his opinion that Rocha was driving while intoxicated. Thus, there was no affirmative evidence putting the existence of these other facts into dispute, only insinuations by defense counsel that Ramirez was lying about them. That is not enough to entitle Rocha to an article 38.23 instruction. *See id.*; *see also Garza v. State*, 126 S.W.3d 79, 86-87 & n.3 (Tex. Crim. App. 2004) (explaining that "mere insinuations by appellant's attorney" that police acted improperly did not create fact issue that police acted improperly, nor did defense cross-examination of police officers who consistently denied suggestion of impropriety); *Rose v. State*, 470 S.W.2d 198, 200 (Tex. Crim. App. 1971) ("No witness was called by the appellant to controvert the testimony of the officers. The cross-examination did not raise a fact issue on the right to arrest. Therefore, the court did not err in refusing the [article 38.23] charge."); *Shpikula v. State*, 68 S.W.3d 212, 217 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (rejecting defendant's contention that jury's right to disbelieve State's evidence, in absence of controverting evidence, entitled him to article 38.23 instruction); *Cerda v. State*, 10 S.W.3d 748, 757 (Tex. App.—Corpus Christi 2000, no pet.) (holding that impeachment of officer on collateral matter does not create factual issue on lawfulness of defendant's arrest); *Trent v. State*, 925 S.W.2d 130, 133 (Tex. App.—Waco 1996, no pet.) (rejecting defendant's contention that he was entitled to article 38.23 instruction on issue of probable cause because "he sufficiently attacked the credibility" of citizen who arrested him); 40 Dix & Dawson, § 4.194 at 282 (noting that "a fact issue is not generated by the possibility that the jury may disbelieve all or some of [the State's] testimony").

Because there was no disputed fact issue that was material to the lawfulness of the challenged conduct in this case, we conclude that the trial court did not err in refusing to submit an article 38.23 instruction to the jury. We overrule Rocha's sole point of error.

## CONCLUSION

We affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: May 12, 2009

Do Not Publish